## Frankford Trust Company v. Manufacturers Life Insurance Company of Toronto, Canada

*Samuel L. Sagendorph*, for plaintiff.

*Richard K. Masterson*, for defendant.

SMILLIE, J., November 4, 1968.—The matter herewith comes before the court on Frankford Trust Company's amended complaint in equity demanding that defendant, The Manufacturers Life Insurance Company of Toronto, Canada be enjoined from denying to tenants of buildings M & N of the Robert Bruce West Apartments of Upper Moreland Township, the use of, or access to the swimming pool and to 16 of

the parking spaces situate on the premises of the Robert Bruce West Apartments.

The original complaint and a petition for a preliminary injunction demanding relief only as to the pool were filed on June 3, 1966. A preliminary injunction was issued pending further hearing. On June 17, 1966, defendant filed a motion to dissolve the preliminary injunction. After hearing, the court, on June 20, 1966, ordered defendant to keep the pool open to tenants of buildings M & N pending the disposition of the cases with the proviso that no rights accrue to the tenants of M & N from the temporary use thereof.

On November 22, 1966, the preliminary injunction of June 3, 1966, was lifted and dissolved subject to plaintiff's right to reinstate or reapply for it at any time.

The court, sitting en banc, dismissed defendant's preliminary objections to the complaint in equity on March 2, 1967, and ordered defendant to file an answer to the complaint. Defendant complied on March 22, 1967.

Frankford Trust Company, on August 9, 1967, filed an amended complaint in which it further demanded injunctive relief with respect to certain parking spaces at the Robert Bruce West Apartments, the use of which had also been denied to tenants of buildings M & N. Defendant filed an answer to the amended complaint and the case was tried on October 3 and 4, 1967.

## FINDINGS OF FACT

1. Plaintiff, Frankford Trust Company, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, having an office and place of business at 4400 Frankford Avenue, Philadelphia, Pa.

2. Defendant, The Manufacturers Life Insurance Company of Toronto, Canada, is a corporation or-

ganized and existing under the laws of the Province of Ontario, Canada, with its principal place of business at 200 Bloor Street East, Toronto, Canada.

3. Plaintiff is presently the owner of buildings M & N of the Robert Bruce West Apartments, a garden type apartment development situate at the intersection of the northwest corner of Carton Street and the northeast side of Horsham Road, Upper Moreland Township, Montgomery County, Pa.

4. Defendant is presently the owner of buildings F, G, H, J, K, and L of the said Robert Bruce West Apartments.

5. Prior to June 1966, *the entire* complex known as the Robert Bruce West Apartments was owned by Pennypack Developers, Inc.

6. Construction of buildings F, G, H, J, K, and L of Robert Bruce West was completed in 1961 and Amon Associates, the rental agent, commenced renting in February of 1961.

7. A swimming pool is located on the section of the premises now owned by defendant, which was in operation in the summer of 1962 and used by all tenants of the Robert Bruce West buildings then in existence and entirely during the summers of 1962, 1963 and 1964.

8. On May 14, 1962, Pennypack Developers, Inc., filed an application with the Zoning Board of Adjustment of Upper Moreland Township requesting a special exception or variance to permit "the addition of two apartment houses to the existing group of six apartment houses all of which will constitute *a single unit* for operation and maintenance, and each unit of which will have an average lot size of 1.84 acres instead of three acres." (Italics supplied.) The two proposed apartment buildings were designated "M & N."

9. Pennypack further represented in said application that "the two additional apartment houses would

be of *the same colonial design and construction* as those already erected and they would be owned, operated and maintained by applicant as *an integral part of the existing group of apartment houses.*" (Italics supplied.)

10. Pennypack stated in said application "that thirty-six additional outdoor parking spaces will be provided which are immediately contiguous to the two proposed apartment houses. In all there will be 236 parking spaces to serve the existing and proposed apartment houses, or *17 parking spaces for each apartment unit.*" (Italics supplied.)

11. The plan attached to the application reveals twenty parking spaces in a lot located between Buildings M & N which contain twelve apartments each. The only other parking lot "immediately contiguous to the two proposed apartment houses" is behind building L adjacent to building M and contains 36 parking spaces.

12. The application for special exception was approved by the Zoning Board of Adjustment of Upper Moreland Township on September 14, 1962.

13. By letter from Nutter Mortgage Service dated March 4, 1963, defendant, The Manufacturers Life Insurance Company of Toronto, Canada (hereinafter referred to as "Manufacturers") made a commitment to Pennypack Developers, Inc. and Meadowbrook Park, Inc., for a loan in the amount of $1,100,000 to be secured by a mortgage on Robert Bruce West land and Buildings F, G, H, J, K, L, *M, and N*, the latter two not yet having been constructed, and a second mortgage on Robert Bruce East.

14. The commitment of defendant further provided that $200,000 of the loan was to be withheld pending satisfactory completion of buildings M & N in accordance with the plans and specifications furnished.

15. Prior to July 1963, Frankford Trust Company (hereinafter referred to as "Frankford"), cognizant of the $1.1 million commitment of Manufacturers to Pennypack agreed to extend a construction loan of $200,000 to Pennypack for the erection of buildings M & N and to take a mortgage on those buildings.

16. Negotiations for the $200,000 loan were conducted by Leonard Polis, President of Pennypack, and Oliver Twist of Frankford. It was understood by both parties that upon the completion of buildings *M & N they would become a part* of the Robert Bruce West Apartments, along with the existing six buildings.

17. On July 9, 1963, Pennypack executed and delivered to Frankford a mortgage on the portion of Robert Bruce West on which buildings M & N are now situated (those buildings not having been in existence at the time).

18. On July 9, 1963, Pennypack executed and delivered a mortgage on Robert Bruce West buildings F, G, H, J, K, L, M & N to Manufacturers.

19. Frankford's mortgage covering buildings M & N was recorded July 11, 1963; Manufacturers' mortgage covering the entire Robert Bruce West complex was recorded July 12, 1963. In addition, a subordination agreement was executed by the parties, by which the mortgage of Manufacturers was subordinated to that of Frankford.

20. Construction of buildings M & N commenced in the summer of 1963, after the execution and recording of the mortgages.

21. On March 31, 1964, proceedings were commenced in the U. S. District Court for the Eastern District of Pennsylvania under Chapter X of the Bankruptcy Act for the reorganization of certain corporations owned by Leonard Polis including Pennypack Developers, Inc., and Meadowbrook Park, Inc.

552

22. Robert Dechert, Esquire, and Maurice A. Kendall were appointed trustees in reorganization for the corporation and continued to operate the Robert Bruce West Apartments. Leonard Polis served as manager of the apartments for the trustees in reorganization.

23. At the time of the commencement of the reorganization proceedings, buildings M & N were approximately two-thirds complete and were unoccupied.

24. The trustees in reorganization completed construction of buildings M & N in the early part of 1965 and the rental agent of the entire complex, Amon Associates, commenced renting the apartments immediately.

25. Buildings M & N are identical in appearance to the other buildings in the Robert Bruce West Apartments; all the buildings are connected by common driveways and grass plots; the driveway lights in front of L are metered in the M building.

26. After completion of buildings M & N, insurance coverage on the two buildings was incorporated into the existing insurance policy on the Robert Bruce West Apartments.

27. Amon Associates rented the apartments in buildings M & N with the understanding that the pool was included in their rental.

28. At the direction of Leonard Polis, apartment manager for the trustees, cards granting admission to the swimming pool were sent by the rental agent to tenants of buildings M & N prior to the summer swimming season of 1965.

29. During the 1965 summer swimming season, tenants of buildings M & N used the Robert Bruce West swimming pool.

30. At the time buildings M & N were completed, a parking lot was constructed between buildings M

& N, and the existing parking lot behind building L was enlarged.

31. The rental agent, having received instructions from Leonard Polis, directed the tenants of building M to park their cars on the parking lot behind building L.

32. From the opening of buildings M & N in February, 1965, tenants of M have consistently used the L building parking lot because of the lack of available parking spaces in the lot between M & N.

33. On April 29, 1966, the U. S. District Court for the Eastern District of Pennsylvania entered an order transferring possession of the Robert Bruce West Apartments from the trustees in reorganization to the respective first mortgagees (plaintiff as to buildings M & N; defendant as to buildings F, G, H, J, K, and L) with permission to foreclose the mortgages.

34. Following the return of possession of the properties to the mortgagees, Amon Associates continued to act as rental agent for the entire Robert Bruce West Apartments (F, G, H, J, K, L, *M and N*) under instructions from the Nutter Mortgage Service.

35. Before the opening of the summer swimming pool season on Memorial Day, 1966, Amon Associates issued swimming cards granting admission to the pool to all tenants of the Robert Bruce West Apartments, *including tenants of Buildings M & N.*

36. After issuing said cards to tenants of M & N, the rental agent was informed by Nutter Mortgage Service that the tenants of buildings M & N could not use the pool during the summer of 1966.

37. Amon Associates then printed new swimming pool cards and issued them to the tenants of F, G, H, J, K, and L only. The pool lifeguards were told not to honor the cards originally issued.

38. Approximately one week after receiving pool cards, tenants of M & N received letters from the rental agent stating that they could not use the pool.

39. Plaintiff foreclosed its mortgage and purchased the premises covered thereby (buildings M & N) at a sheriff's sale on June 22, 1966.

40. The mortgage of defendant was foreclosed and the property covered thereby (buildings F, G, H, J, K, and L) was purchased by Manufacturers at a sheriff's sale on July 27, 1966.

41. Prior to January, 1967, tenants of M & N parked their cars in the parking lot behind building L, having received instructions from the rental agent to so do.

42. On January 5, 1967, tenants of M & N received a written notice on their automobiles from Harry Green, the resident caretaker of buildings F, G, H, J, K, and L, that they were no longer to park in the lot behind building L and that their cars would be towed away if they did park in the said lot.

## ISSUE

Does plaintiff have an implied easement appurtenant to the M & N tract by which tenants of buildings M & N of the Robert Bruce West Apartments may use the swimming pool and parking area situate on defendant's portion of the complex?

## DISCUSSION

It is agreed by both parties that, in the absence of an express grant of an easement, Frankford can establish a right to use the swimming pool and parking lot only by showing the creation of an easement by implication. An implied easement can arise only upon the severance of the unity of ownership in land. The determination of the existence or creation of an implied easement is dependent upon the intention of the parties to the conveyance separating ownership. The un-

expressed intention is distilled from the circumstances existing at the time of the conveyance of the estate: Lerner v. Poulos, 412 Pa. 388 (1963).

The well established rule for determining implied easements is "that where, during the unity of title, an apparently permanent and obvious servitude is imposed on one part of an estate in favor of another part, which servitude, at the time of severance, is in use and reasonably necessary for the fair enjoyment of the other part of the estate, then upon a severance of the ownership, a grant of the right to continue such use arises by implication of law": Heffley v. Lohr, 149 Pa. Superior Ct. 586 (1942); Vanderwerff v. Consumers Gas Company, 166 Pa. Superior Ct. 358 (1950).

Four elements, then, are essential to the creation of an easement by implication on the severance of the unity of ownership in an estate:

1. a separation of the title;

2. such continuous and obvious use before the separation as to show an intention to make the alleged easement permanent;

3. the easement must be necessary to the beneficial enjoyment of the land granted or retained; and

4. the servitude should be continuous and self-acting: Becker v. Rittenhouse, 297 Pa. 317 (1929); Baptist Church in the Great Valley v. Urquhart, 406 Pa. 620 (1962).

The parties are agreed that the first element, separation of title, occurred June 22, 1966, the date on which Frankford purchased buildings M & N at sheriff's sale. At all times prior to that date, a unity of title existed. Before the commencement of chapter X reorganization proceedings, title to the entire Robert Bruce West tract was in Pennypack. The trustees in reorganization succeeded to Pennypack's title to the entire tract and retained it until the June 22,

1966, sheriff's sale at which buildings M & N were sold to Frankford.

The second prerequisite to the implication of an easement is that the use before severance be continuous and obvious, manifesting an intent that the easement be permanent.

Renting of buildings M & N commenced in February 1965, 17 months prior to severance of title. During the entire period and for approximately 6 months thereafter, tenants of buildings M & N used the parking lot behind building L. Inhabitants of M & N made continuous and obvious use of the swimming pool during the summer of 1965 and were issued cards for the 1966 pool season by the rental agent. Just before Memorial Day 1966, Manufacturers, then a mortgagee in possession, informed tenants of M & N that they were not to use the pool.

The fact that the permitted use of the pool terminated one month prior to severance of title will not dissuade the court from its conclusion that the use before severance was, indeed, continuous and obvious.

The letter designation of the units has some significance in that it shows the intention to have a completely identical complex of buildings each in alphabetical sequence F, G, H, J, K, L, M, and N. If the units were not to be regarded as part of the whole plan they would have been given different designations as names such as "Park House," "Colonial House," or lettered in a different sequence such as "A" and "B" or "North" and "South" buildings. It is too obvious to require emphasis that the lettering of M & N was to carry out the over-all plan and scheme which contemplated that all were to be alike, treated alike, and with alike facilities and appurtenances.

Thirdly, the easement must be necessary to the beneficial enjoyment of the land granted or retained.

Implied easements need not arise from absolute necessity. The servitude may arise where it is *"evidently necessary* to the convenient enjoyment of the property to which they belong": Baslego v. Kruleskie, 162 Pa. Superior Ct. 174 (1948), or where it is *"reasonably necessary for the fair enjoyment* of the other part of the estate": Heffley v. Lohr, 149 Pa. Superior Ct. 586 (1942). (Italics supplied.)

There can be no question that in modern day apartment life, close, easily accessible parking is necessary to the convenient enjoyment of the property. Today, parking has become an absolute necessity. In fact it becomes the sine qua non of permitting the construction of apartment houses.

The necessity of a swimming pool is less absolute but it, too, today becomes "reasonably necessary to the fair enjoyment" of the living quarters. The tenants of M & N signed their leases believing that they would be permitted to use the pool. The use of the pool was a condition of the offer of the landlord to lure the prospective tenants to prefer the Robert Bruce Apartments to others. The *"convenient* enjoyment" of the property, as used in the Baslego case, supra, applies forcibly to the use of a pool.

Defendant's argument that if additional parking spaces are needed for M & N, Frankford should construct them adjacent to Building N is without merit. In Heffley v. Lohr, supra, a similar contention was dismissed by the court, stating, in affirming the creation of an easement by implication:

"It therefore is unimportant that plaintiff's land abuts the State Highway and that access thereto might be had by the construction of a new driveway on her land, or that there are other springs on her land from which she could obtain an adequate water supply by installing a system of her own."

The fourth prerequisite, the servitude must be continuous and self-acting, as distinguished from discon-

tinuous and used only sporadically, is also present here.

The swimming pool was used by tenants of M & N every day during the summer of 1965. That the pool fell into disuse for a nine month period during the cooler months is irrelevant for pools are not used during the winter months. Similarly, the parking lot behind building L was utilized continuously and daily by tenants of M & N from the time they moved into Robert Bruce West until January, 1967.

The four essentials to the creation of the easement by implication being present, the existence of the easement in favor of plaintiff is further reinforced by an examination of the intention of the parties.

Easements by implication arise upon severance as an inference of the intention of the parties to a conveyance of land as drawn from the circumstances under which the conveyance is made: Schwoyer v. Smith, 388 Pa. 637 (1957).

The date of the conveyance is vitally important because it is to the surrounding circumstances on that date that we must look to determine the intention of the parties. Plaintiff and defendant are not in agreement with respect to what the conveyance was and when it occurred. Frankford argues that the conveyance occurred on July 9, 1963, when Pennypack gave Frankford a mortgage on the tract on which M & N were to be built. Manufacturers contends that conveyance must always occur at the same time as severance, and that a mortgage cannot serve as a conveyance for purposes of the requirements of an implied easement. To justify its conclusion that a mortgage is not a conveyance, defendant cites Bulger v. Wilderman and Pleet, 101 Pa. Superior Ct. 168 (1930), which states "the rule in Pennsylvania is that although in form a conveyance of title, a mortgage is in reality only a security for the payment of money or perform-

ance of other collateral contract"; nevertheless, the mortgage is considered a conveyance as between the parties so far as is necessary to enforce it as a security: Winthrop v. Arthur W. Binns, Inc., 160 Pa. Superior Ct. 214 (1947).

Because no intent is expressed in the actual conveyance in cases of implied easements, the conveyance is important only to establish the period of time when one must contemplate the surrounding circumstances. A court, in enforcing an easement by implication, is merely declaring what it believes to be the unexpressed intention of the parties.

In the present case, while the mortgage was merely a security interest until the sheriff's sale on June 22, 1966, it is the circumstances surrounding the execution of the mortgage that we examine to determine the intention of the parties. To regard the date of conveyance as June 22, 1966, when Frankford purchased the tract at sheriff's sale, and to consider the surrounding circumstances at that time, would be to ignore the obvious intent of the developer, Pennypack, and its successors in title, the trustees in reorganization, and to distort the original goal of a single unified apartment complex.

Pennypack's mortgages to plaintiff and defendant were executed on July 9, 1963, at a time when Pennypack was solvent and none of the subsequent difficulties were expected. It is clear from the simultaneous execution of the two mortgages and the agreement by which Manufacturers subordinated its mortgage to Frankford's that the whole transaction was, in fact, a tripartite agreement. The circumstances surrounding the transactions of July 9 through 12, 1963, will be dispositive of the case.

Every factor indicates that originally all the parties considered the two additional buildings M & N, to be part of the Robert Bruce West Apartments and the

whole complex to be one unit. The two new buildings were similar in design and appearance to the six already constructed; they were connected by a single system of roadways and lighting; the revised plan of June 25, 1963, shows the proposed buildings were to be part of the existing Robert Bruce West complex; the representations made by developer Pennypack to the Zoning Board of Upper Moreland Township for a special exception to construct M & N further indicate the intended unity of the entire Robert Bruce West Apartments. The enlargement of the parking lot behind building L at the same time buildings M & N were being constructed indicate that the tenants of the new buildings were to use the enlarged L parking lot; Pennypack's representation in its application to the zoning board in 1962 that the two additional apartment buildings would be operated as an integral part of the existing buildings clearly shows what the original intention with respect to M & N was. It is manifest from these actions and even the naming or lettering of the units show that all the buildings, F *through* N, were to comprise a single integrated unit. To break up that unit now would rend and destroy the original intentions of the parties.

The situation presented to the court is a novel one, but one which will appear more frequently as apartment dwellers increase and the demand for apartments multiplies. Financing of large-scale projects such as the Robert Bruce West Apartments cannot often be obtained from only one lender. Where several lending institutions each take mortgages on different buildings of one apartment complex, they look to the property covered by the mortgage only as security for their loan. If the unexpected happens, the mortgagees foreclose and the different buildings come under several different owners; to prevent the tenants of one building from using facilities placed in another building, but obviously intended by the developer to

be used by tenants of all the apartments, would work an injustice on tenants of the precluded apartments, part of whose inducement for renting is the promised use of the facility.

In the present case, a denial of the use of the pool and parking lot to tenants of M & N not only would thwart the manifest intention of the developer of Robert Bruce West by splitting the complex into two separate apartment projects, but would violate the contractual obligations to the tenants.

Defendant argues that, as a mortgagee, it must consent to an easement not in existence at the time of the execution of the mortgage. Defendant's recitation of the law is accurate, but its application of the law to the facts of the case is not.

The security of a mortgage cannot be impaired by an easement subsequently imposed on the land without consent of the mortgagee. The title of the purchaser at sheriff's sale relates back to the date of the mortgage and defeats all intervening estates and interests acquired subsequent to the mortgage: Dexter v. Pennsylvania Power Co., 127 Pa. Superior Ct. 419 (1937); Vanderwerff v. Consumers Gas Company, 166 Pa. Superior Ct. 358 (1950).

The general rules stated above cannot, however, be applied to the situation at bar to defeat the implied easement in favor of plaintiff.

In Dexter and Vanderwerff, supra, the implied easements came into existence *after* the mortgages had been executed, without the knowledge and consent of the prior mortgagees. In both cases *all the events* occurred *after* the mortgages had been executed. There were no indications whatsoever of any prior planning from which an easement could be implied.

In Dexter v. Pennsylvania Power Co., supra, the mortgage was executed in 1917. In 1928, the mort-

gagor granted a deed to the power company for the erection of power lines to serve the mortgaged property in addition to providing service to neighboring properties. The court ruled "Our conclusion is that, notwithstanding this grant of the right of way was obtained for a public purpose, it was not binding on the prior mortgagee."

In Vanderwerff v. Consumers Gas Company, supra, the mortgagor constructed a sewage disposal system after he gave the mortgage. The court stated in its opinion as follows:

"The security of a mortgage cannot be impaired by an easement *subsequently* imposed on the land without the consent of the mortgagee. Dexter, et al. v. Penna. Power Co., 127 Pa. Superior Ct. 419, 193 A. 93. The title of the Trust Company which it later conveyed to Berks related back to the date of the mortgage and the foreclosure therefore defeated all interests, including easements, acquired or created subsequent to that date." (Italics supplied.)

In the case at bar, the implied easement was created in the original plan dated November 25, 1960, as amended May 7, 1962, as shown as exhibit P-2 which shows the entire complex. Furthermore, on May 14, 1962, Pennypack Developers, Inc., applied for a zoning variance to Upper Moreland Township, using the plan of the entire development. The application was granted on September 14, 1962; it allowed a reduction in average lot size to 1.84 acres instead of 3 acres as required by the ordinance. The variance was granted on the *entire development* and not merely on the ground covered by buildings M & N. On March 10, 1961, Pennypack Developers, Inc. was allowed a variance to 2.27 acres based on 6 units or a total of 13.62 acres. The second request for a variance covered 14.72 acres, an increase of 1.10 acres, for *two additional* buildings which were "M &

N." The variance could only legally have been granted by treating all the units as one and tied physically to the plan with the swimming pool and parking location.

In the present case, while the easement was not in existence until June 22, 1966 when severance occurred, the prior mortgagee, defendant herein, had full knowledge of the intended use of the swimming pool and parking lot at the time its mortgage was executed in July of 1963. Manufacturers was cognizant when it took its mortgage that the two new buildings, M & N, were to be part of the single functional entity of Robert Bruce West Apartments. It was aware that the pool was intended for the use of all Robert Bruce West tenants, present and future. In taking a mortgage on the whole Robert Bruce West complex (it subordinated its mortgage on M & N to Frankford) it indicated its consent that the apartment project was to be maintained as a single unit. Manufacturers cannot now deny the functional unity of the complex to which it consented in 1963.

Furthermore, with respect to the L parking lot, Manufacturers did not protest the use of it until January 1967, more than six months after severance. Its acquiesence in the use of the lot by tenants of M & N for the half-year period further indicates its consent to an implied easement for said use. Defendant cannot now deny its consent to a use which was obviously intended by all parties in 1963.

For the foregoing reasons, the court is compelled to conclude that an easement by implication exists in favor of the plaintiff for the use of the swimming pool and the parking lot behind building L.

### CONCLUSIONS OF LAW

1. Manufacturers in July of 1963 considered the Robert Bruce West Apartments as a single functional unit, and by taking a mortgage on the proposed build-

ings, M & N, as well as those in existence at the time, indicated its intention that M & N were to be part of the Robert Bruce West complex.

2. A tripartite financing agreement was entered into on July 9-12, 1963, by the simultaneous execution of mortgages to Manufacturers and Frankford by Pennypack and the agreement by which Manufacturers subordinated its mortgage to Frankford's.

3. The circumstances surrounding the execution of the mortgages on July 9, 1963, indicate that the Robert Bruce West complex, including the proposed additions, was intended by all parties to remain a single functional unit in the future with all the facilities of the swimming pool and parking.

4. The action of the trustees in reorganization in completing buildings M & N and leasing apartments therein with the contested swimming pool and parking privileges was a continuation of the original intent of the owner and mortgagees to maintain and operate the Robert Bruce West Apartments as a single functional entity.

5. The use of the swimming pool and the parking area behind the L building by tenants of M & N was a continuous and obvious use, fully intended to be permanent, and was necessary to the convenient enjoyment of the apartments in M & N.

6. The use of the pool and parking lot behind L was continuous and manifest from the commencement of the tenancies in M & N in February 1965 until June 22, 1966, when unity of ownership of Robert Bruce West was severed, so as to give rise on that date to an easement by implication in favor of plaintiff.

7. The use of the pool and parking lot behind L by tenants of M & N was consistent with the use of the same facilities contemplated by the original owner and both mortgagees on July 9, 1963, when the mortgages were executed. Such use puts into effect the un-

expressed intention of the parties to the mortgages at the time of the execution of same, said intention inferred from the surrounding circumstances existing on July 9, 1963.

8. Upon severance of the unity of ownership of the Robert Bruce West Apartments on June 22, 1966, an easement by implication for the use of the swimming pool and parking lot behind building L on said premises was created in favor of the plaintiff, Frankford Trust Company.

### ORDER

And now, November 4, 1968, the prayer of Frankford Trust Company is granted. A permanent injunction is hereby issued forbidding Manufacturers Life Insurance Company of Toronto, Canada, its officers, agents, servants, employes, successors, assigns, and all other persons or bodies acting by and under or on behalf thereof, from any interference whatsoever or howsoever with the easement for the use and enjoyment of the swimming pool and parking area, including ingress and egress thereto, by the tenants of the apartment buildings known as M & N of the Robert Bruce West Apartments, located at the intersection of the northwest corner of Carton Street and the northeast side of Horsham Road in Upper Moreland Township, Montgomery County, Pa.